On behalf of the appellate, Mr. Michael Kline. May it please the court, I'm Joel Thiem on behalf of the appellant Silas Jayne. The legal issue presented in this appeal is whether the trial court properly directed a finding against the claimant, where the claimant's testimony was neither contradicted nor inherently improbable. The context for this issue arose in the decedent's estate of the claimant's mother. Prior to her death, the decedent had deeded property to the claimant in exchange for payments of $150,000. The transaction was later voided in the estate case by the circuit court on the grounds the deed was executed in the decedent's name and not in the trust capacity. The claimant then filed for reimbursement of the amounts paid to purchase the property. At the hearing on the claim, the claimant proceeded under an unjust enrichment theory, asserting that retention of both the real estate by the estate and the purchase price paid for it constituted a windfall to the defendant. The claimant's testimony regarding payments to his mother was uncontradicted. Moreover, his testimony was substantially corroborated by the testimony of his brother, Alexander Jayne, who testified that he was aware that his brother was purchasing the property from their mother and that he was making cash payments to her in the timeframe indicated. Let me interrupt you for a second on this cash payment issue. So the brother Alexander testified that he witnessed cash payments? He said he knew there were cash payments being made. I don't recall if he said he actually physically saw them or not, but he had knowledge of them being made. He did say that he did not know for certainty what they were for, but he did say they were in the timeframe indicated by Silas' testimony. I need you to flesh that out a little more for me. So what exactly did he say? He said that he had knowledge of the – I believe those are the exact words. I'm not 100 percent sure without looking at the transcript. But I think he said he had knowledge of payments being made by his brother to his mother. And when asked when, he confirmed that it was about the time period that the testimony of his brother indicated that he was making payments. Okay, so that was his – best you can recall, that was his phraseology. He was aware of or he had knowledge, I'm not sure, he had knowledge of – did he use the word cash as opposed to indicate green U.S. currency? Yes, he did. Did he say how much? He didn't know how much. He just says he knows that his brother gave his mother cash. Yes, he knew his brother made cash payments periodically during the time period that was at issue. Well, I mean, this is your opportunity to flesh this out. I mean, periodically could – what does that mean? I mean, did the testimony say, I know he gave her cash on a monthly basis during this time? Or how do you – it's pretty vague right now. He didn't have the specifics as to when the payments were made or the amounts. But he did testify that his brother was making cash payments. But he didn't know what the payments were for, when they were made, the amounts that were made, who else was present. He knew nothing other than what Silas had told him. Well, when they were made, he confirmed that it was within that period. He didn't know a date. He didn't even know a year. He just knew it was sometime potentially in that time frame, right? Well, he knew – he testified that he knew for sure it was in that time frame. He didn't know the exact dates or the amounts. But he knew that it was within the time frame. The testimony of the claimant was that he had made a number of payments over a period, expanding that he wasn't sure himself as to how long it was, but it was less than two years. And it's during that time frame, Alex testified that he had seen his brother or had knowledge that his brother had made those payments. Well, that's a big – so what was the – did anybody explore the basis of his knowledge? If he didn't see it, what was the basis of his knowledge? Was it simply the same man saying – I mean, Silas testified he did this, right? Silas testified he did it, correct. And so is the other brother just saying his basis of knowledge as Silas told him in the same way he testified, or is there some other basis for his knowledge? I don't know – I don't recall if there was any specific basis articulated in the testimony. Okay. The case law is clear that the finder of fact cannot simply reject uncontradicted testimony at the close of a plaintiff's case unless the testimony is inherently improbable. This was the ruling in Brown v. Baker cited in the brief for the Illinois Supreme Court, saying the trier of fact cannot simply disregard unimpeached testimony. Well, they can disregard it or weigh it based upon the credibility, and isn't it that determination of the trial court to determine the credibility of the witnesses and not ours? At this stage of the proceeding where it was a motion for a directive finding, the assessment of credibility is limited to whether or not there is an absence of proof on one element or not. It's our position that that was not what happened. At the end of the entire case, of course, the trial court has a broader discretion in regard to the credibility. Well, can't the court also look to see if the testimony has been contradicted by the circumstances otherwise presented thus far in the case? Yes. For example, I believe Silas testified that he made a $12,000 check payable to cash that he said was for the purchase of the property, yet it was drawn on a joint checking account and that was payable to cash and there was no follow-up. So couldn't the court consider that the testimony that the $12,000 check was for the purchase of the property was contradicted by the circumstances of that check? I don't think so. I think the court can say that it's not corroborated by any external circumstances, but it wasn't contradicted in any way. His testimony was clear that the money in that account was his money and that he had written the check and given it to his mother as partial payment for this purchase. Isn't a joint checking account inherently the proceeds in the joint checking account are the property of both the holders? Legally, that's certainly true. I mean, isn't that sort of what the court's supposed to follow as legal precedent? The idea that was set forth in this was that the account was established for the benefit of his mother and that he would put money in so that she would know that there was money in an account that had her name on it. That was not in the record up to the point of the directive finding, though. That may not have been. I apologize. That may not have been until then. Well, but even if that was in the record, you say the point is he put money in that account for the benefit of his mother. He put money in the account so that his mother would know there was an account with her name on it. We had funds in it. He has testified that it was his money and that he acted on it. But you agree that was not in the record up to the point of the ruling on the motion for directive finding? Right. The court definition of what constitutes inherently improbable as to what allows a court to reject uncontradicted testimony was set forth in this court's ruling of People v. Bovass and also cited in the brief. Three possibilities. One, something that's physically impossible can be rejected. Excuse me. Something that directly contradicts matters of common knowledge can be rejected. And something contrary to the laws of nature can be rejected. In the incident case, none of those applied. And it's our position that his testimony was unrebutted and uncontradicted. The cash purchase of real estate over time between family members is certainly not contrary to any of those three elements that I articulated. The Bovass court is directly on point when it stated if a statement is merely inconsistent with the reasonable probabilities, the court may not simply reject that testimony. In this case, that was the error of the trial court. We'll come back to that. The lower court also focused on the cash portion of the transaction. Remember those two checks. One, the $12,000 you mentioned, and the other one's $36,000, which was certainly not from that account. It was a joint account. Additionally, there was documentation that substantiates Mr. Jayne's testimony, which is that there was a transfer tax declaration signed by his mother, which identified $150,000 as the proceeds of the sale. Wasn't that part of the documents that were notarized by someone who never witnessed the signature? I don't believe that document requires notarization, so I'm not – I don't remember. Was that attached? Yes, it was. Okay. It was page 6. It was a bit of an issue. The – so it's our position that they – With respect to the tax document, too, didn't Alexander also testify that his mother, during that time period, would pretty much sign whatever you put in front of her? She really had some difficulties grasping what was going on. He said that at some point during that two-year span, she became less capable of understanding things, and that that could have happened. He didn't, obviously, have any specific relevance in regards to this study. All right, well, listen, do me a favor here and tell me again. Summarize what the testimony is that's uncontroversial. His testimony is that he made the payments to his mother. Okay, but, I mean, I need to know, like, he made the payment. What's his claim? He paid how much? $150,000. And we know that he's claiming that 12 of that and 36 of it was by check. Correct. And what's the rest of it he's claiming he paid by cash? He paid her cash periodically over that period. And just the term periodically is all we have. He doesn't testify and his mother didn't testify as to when these payments were made. He acknowledged that he didn't have any record that indicated the exact dates of the payments or the amount. Didn't he testify? He just sort of kept a running total in his mind. He did. He knew when it was done. He did. He said he knew that he, you know, he was meant to track how much the balance was due and keep making payments until that was done. How old was the mother during this time? I don't even recall. I don't know if her age is in the record. She died in 06, so that would have been a couple years previous. Okay, so we've got this testimony that he's paying his mother cash money periodically. Is there any testament of what mom's doing with the cash? No. There was no testament of that. In fact, I think then doesn't the trial court make a comment that he wonders what happened to the cash? Correct. He made a comment that there was no proof as to that, and we consider that to be a neutral statement. There's no proof one way or the other as to whether this money was what was done with it. Because of some of the evidentiary requirements of the MIS Act, et cetera, it's hard to prove that. The two-stage analysis for the directive finding under Section 2-1110 and the case law under that indicates that, first, the court must determine at the directive finding stage whether there's some evidence on each point, which it clearly was that was not the judge's problem. And then, secondly, he can move on to the stage where he can determine if anything invalidates the testimony in regard to the elements. And he has a limited assessment of credibility in that regard. The court is authorized to assess credibility, but the trial judge expressed his suspicions of all cash transactions. He didn't comment on the credibility of the witnesses. This is not the kind of negation required to say that this element of the offense or the element of the cause of action was negated. He didn't say, I don't believe this. And, frankly, I don't think he could have provided that he would be any more right to do that if he had. The testimony was uncontradicted and partly corroborated by his brother. And the directive finding was improper. Now, the appellees respond by citing a number of cases, including Robinson v. Robinson, and Justin Richmond case, also in the family context, where there was a married couple who were building a home on the father's parents' property. The clear intention from the testimony was that they would someday occupy the home and the parents of the husband would deed the property to the young couple. They got divorced in the interim. Part of her divorce action was a claim against the parents for reimbursement of the amount that she had spent. The court said strictly looked only to the benefit that accrues to the recipient. But in this case, equity required them to go forward and say that even if there was a partial benefit to the recipient because the house hadn't been completed, she should get some reimbursement for this. In our case, we don't have that issue about the partial benefit. The benefit was cash. There's no doubt that the estate had both the real estate and the payments by the end of the transaction. But the Robinson case, I think, is the closest parallel that we can come to in this court. It is a family transaction. It's a case where the court said we don't have to look at unjust enrichment as a formulaic kind of analysis. We have to look at the equities of the situation. In this case, it seems clear to me that the equities would require reimbursement to my client for payments he had made when he had not received the benefit of what those payments had been intended for. The secondary issues that we didn't focus on as much on the briefs, there's three other claims. There was a claim for... Before you go, though, I want to ask a couple of quick questions here. What is your position... Let me back up again. What is the time period, whether these payments are made periodically during the relevant time, what is that time period? Silas Jane testified that it was less than two years. Less than two years. So you paid $102,000 in cash in less than two years. Correct. And what's your position on the trial court? Did the trial court rule that the notes did not come in because they didn't satisfy the best evidence rule? Yes, we're not challenging that at all. Okay. You can move on then to your... We're going to make three other questions. My client made improvements to the property under the belief that it was his. There was a manure pit that was constructed, there was some fencing, and there was a survey that was done. The respondents recite in their briefs that that shouldn't be included because the decedent didn't specifically request it and that it was done by my client in the anticipation of ownership. I think that obscures the reality that the test is whether there was an improvement in value to the property. Is it whether there's a benefit? Correct. Can you point to anything in the record where there was testimony that the fence, the cement manure pit, were benefits to the property? Silas Jane testified that they were benefits in the sense that they were advantages to the property. Right, but advantages to his use of the property. But did he ever testify, or did anyone ever testify, that these are a benefit to the property, as opposed to the trial court, I think, found that the cement manure pit could be an albatross or a tremendous liability to the property in some other light? The trial court did speculate that it could be an asset or a liability to an individual, but I think there was testimony that indicated that, in Silas Jane's opinion at least, that was a benefit because the property, where it was situated and so on, would be beneficial to have that. As the court pointed out, what one person intends to use a property for and the next owner may not, there's always that issue so that I don't think that we can conclusively base a determination on what the individual person wants, but what actually is improving the property in value. Here the issue would be whether or not the improvements, if you will, were a benefit to the estate, not whether they were a benefit to Silas. Right, and the determination of that would not be what the decision wanted or didn't want. It would be whether the value of the property, whether it could be sold for more as a result. Right, was there any testimony to that? There was no specific testimony in regard to the numbers, but there was testimony by Silas that, in his opinion, it was a benefit to the estate by virtue of the location of the property in the farmland area. Yes? Can you just touch on that survey? What's your position with respect to the survey? In respect to the survey, the record is unclear as to when the survey was done. It's our position that it was done in anticipation of these transactions and therefore it was an expense that should be reimbursed whether it was a benefit to the estate or not, in the same way that the judge below granted reimbursement for the real estate taxes that were paid. That clearly benefited the property, and therefore it was an important thing that would be reimbursed. Okay. Counsel, your time is up, so you'll have time. If you want to make a quick closing comment, you'll have time in the rebuttal, too, so. Okay, thank you. In conclusion, I would just say that I think the uncontradicted nature of this testimony precludes the judge from saying at this stage of the proceeding that the claim should be denied, and we have to go forward and hear the balance of the evidence before making a determination. I guess I'll go first. Thank you. Counsel? Good morning, Your Honors. My name is Michael Kellen, and I represent Stephen O, who is the administrator of the Estate of Gloria Jane. Good morning, Counsel. Your Honors, in looking at Counsel's reply brief, he lists the reasons and the testimony that he believes that the claimant gave that proves that the claim should be recognized and there shouldn't have been a motion for direct defining. And I'd just like to address each of those points. I think Your Honor asked exactly what testimony is there. So Counsel says he purchased the property at issue from his mother. First, I would point out that obviously, and I think the Court, by its questions, has recognized this is an interested witness. This is not somebody who's coming in here to give testimony to the Court without hoping to gain some advantage. Well, the first thing about this closing is, and the Court's already asked a question about this, this is a closing that occurred allegedly with an attorney that represents Silas Jane, who's never met Gloria Jane, never met her in his life, and he's notarizing her signature. There's all kinds of transaction documents, transactional documents that she's allegedly signed. Now, Silas says that she signed them in front of him, but this attorney that did the closing notarized the signature of a woman who also the record points out is somebody who's having some competency issues because you can put things in front of her and she won't know what they are and she'll sign them. I think that's a serious issue. Whose burden is it at that point to show that she was not a competent party? That she was a competent party? Not competent. Whose burden is it to show that she was not competent? I don't think either side has to show she's not competent. I think that the evidence shows that there were issues with her competency. I don't think either side has a burden with that regard. I think it brings into question the improbability of this transaction. Right, but isn't that something that should be borne out in a full trial? Well, Silas Jane is alleging that he had this transaction with his mother and we're family and we have a handshake, but the facts belie the fact that this was a clean transaction. So again, we have a contradiction with regard to his testimony just by the facts in and of themselves before the estate can put on a case. How do you have a contradiction? He's saying that there was a transaction and he saw his mom sign these documents. We know that the closing that allegedly occurred, occurred outside of her presence and possibly without her knowledge. How do you know that? Because the attorney who notarized her signature never met her. The attorney who prepared all the documents never met her. And that came in at the hearing. It did here. And furthermore, again, we know that she's a person who has some competency or at least a person who's going to sign things. This, I believe the court asked them and certainly the entire record, Mrs. Jane died about a year and I think 14 months before. Well, she signed the deed about 14 months before her death. And the brother had testified some issue, Alexander, some issue with her competency, correct? Correct. So I think that this alleged transaction is extremely suspect. You have a biased witness, an interested witness. You have facts that would raise concern for anybody who's looking out for an elderly person saying her signature's notarized, she's got some competency issues. Then counsel argues that the sale had been invalidated because the mother had deeded to him individually and not in the capacity as trustee of the trust that held title. Well, that's also raises very great suspicion about this transaction. You have an attorney involved, the property's in the trust. Mr. and Mrs. Jane took the time to set up a trust. How logical is it for Mrs. Jane to now sell the farm to one of her three sons that they put this property in their trust for? Obviously did some estate planning with an attorney. Now she's going to sell it to one son for $150,000 and exclude her other sons. It's improbable. It's illogical. It doesn't make any sense. It's not, it doesn't sound like Mrs. Jane was getting good advice, minimum. And she certainly wasn't getting advice from the attorney who prepared the sales transaction documents. He never met her. Who's representing her? Nobody is. She's completely unrepresented in this transaction. Before you get to your next point, why would he go to the expense of making these improvements if he didn't think he owned the property or was in the process of buying it? Well, I think he did think he owned the property. I think he thought he owned it. I'm not saying he paid for it. I think he thought he got the property from his mom. So he did, I agree, he thought he owned it. I'm not agreeing that he paid for it. Okay. Go ahead. With regard to the $150,000 was point C, that he paid her a total of $150,000. This is one of the most ludicrous arguments I've heard a person make before a court. And Judge Countryman couldn't find any other. I don't care if you're Bill Gates. If you give somebody $50,000 cash, you're going to remember that. And I specifically asked him that question, Trapp. Might you have made a payment of $50,000 at one time? Maybe. Who does that and doesn't remember it? And nobody gives their mom $50,000 and doesn't remember making that payment. But I know he's not sure how long it took him to pay it off, as one of your honors asked. So there's $102,000 allegedly being paid to mom, but we don't know when. There's no receipts. There's no documents. And then the money from the check that's paid to her in the beginning, allegedly paid to her for this purpose, goes into a joint account with his name on it. Which check is that, the $12,000 or the $36,000? I believe the $36,000, Your Honor. I'm sorry, the $12,000. But I thought, and you have to forgive me because this case has been going on for a while. This isn't the, these checks have been bouncing back and forth in depositions. And you have to forgive me because, I'm sorry. I want to ask you a question about the $36,000 check. Yes. And accept on face value that the $12,000 check was the one that was allegedly drawn on the joint account. The $36,000 check was allegedly drawn on an account held by Silas and made payable to Gloria. Correct. Now, why isn't that sufficient to get past a directive finding, at least for that dollar amount? Well, again, it's inherently improbable because I want to make sure that I'm speaking accurately. The source of the checks is one issue. But where the checks were deposited, and that's what I was addressing, is another issue. And forgive me if it's not in the record, but it's in my mind because of this case. Well, with all due respect, what you can't argue here this morning is what is in the record. And I believe that, and my recollection is that that money was deposited into a joint account. That's my recollection, Your Honor. And I didn't double-check that, but I thought that's an argument I made in my brief. You're talking about both checks then? Correct. They were both deposited into a joint account. It was held by Silas and Gloria. Okay. And so the $36,000 check was drawn on a checking account that did not have Gloria's name on it, but your recollection is the record will show it was deposited into an account that had Gloria's name but also had Silas' name. Yes, Your Honor. That's my recollection. What if that doesn't jive with the record? Get back to Judge Jorgensen's question. If, in fact, the check is drawn on an account that only has Silas' name into an account that only has Gloria's name, is that enough to get this $36,000 payment past the motion for a directed verdict? I don't believe so, Your Honor, because there's also no indication as to if he did make a payment to her what it was for. There's no testimony. But it's his testimony. It's his testimony. And this is the guy who pays $50,000 cash to people and doesn't remember. Isn't that enough to make a preemptation case? That $36,000 payment? It could be argued that it's enough to show that that payment was made, but he's not saying that's the only payment he made. No. So when you take it in its totality, when you take all of these alleged payments being made, let's say he did possibly make those payments. That's not the issue before the court as to whether he made any payments. The issue is did he pay her $150,000? And I would say the whole transaction is suspect. Wait. Back up. I don't remember anything in the record that says what issue is that it's either $150,000 or nothing. He testified and made $12,000. He testified and made $36,000 and then $102,000 in cash. What in the record would preclude us from piecemealing that? Because he said in total he had a transaction with her and he paid her $150,000. Right. And let's assume for the sake of argument. That you don't believe anything beyond the first two payments. Right. The whole transaction is suspect. Why is there any credibility in anything that he's saying about payments he makes to his mom? Because he's got the check. I'm sorry. Because he's got the check. I mean, that's why I'm asking you what is in the record that would preclude us from viewing these as three separate parts of a transaction? Because I don't think that you can divide the transaction piecemeal and say, well, maybe he paid her this amount of money. But we have no reason to know why he paid her the rest. The claim was for $150,000, not part of $150,000, not for a couple checks that were made. It's for $150,000. The entire transaction when you add it up is completely suspect. So your position is that the cause of action he had to advance past the motion was a cause of action for $150,000? Correct. In exchange for buying a piece of property? Correct. That's what he had to prove a privatization case on? Yes, Your Honor. And he can't prove that by establishing part of it? That would be my position, Your Honor. I think that's correct. But isn't the whole theory of a just enrichment, you know, that the estate got the property back, so any monies that he can show he paid, he should get restitution for that or be paid back for that? So let's assume if he can only prove that he paid $100 towards the purchase price, still under an unjust enrichment, shouldn't he get that $100 back? I would respectfully disagree with the court for this reason. Okay. The unjust enrichment deals with the improvements he made to the land. It doesn't deal with the payments. He's saying I had a contract, this was a legitimate deal, and I paid. He's not saying I unjustly enriched the estate. I suppose you could take that approach, Your Honor. You can't have both the contract and an unjust enrichment, however. I would agree, Your Honor. So I'm saying that the $150,000 is a contractual issue, not an unjust enrichment. Partial performance on a contract. That contract is so rank with suspicion that I don't see how the judge could accept any of that. What's your position with respect to the other items that he's being asked, he's asked for reimbursement for and the taxes and improvements? I think Your Honor has asked the question and I think I made the argument in my response of pleading that there is absolutely not one iota of evidence here that any of these alleged expenditures on behalf of the estate were benefited the estate. We have, again, the interest of testimony of Silas Jayne saying I put a manure pit there. Okay. You built a manure pit on a farm. How do we know that the farmer needs a manure pit or that that's a benefit to a farm? And, by the way, I think at some point Judge Peterman said, you know, I know what horses do on a farm. I mean, but still he looked at it and said, where's the benefit to the estate? Silas Jayne was using it. He built it for himself. The difference between this case. Wasn't it aesthetically better, Mickey? I'm sorry, Your Honor. Wasn't it aesthetically better? I'm sorry. A manure pit, Your Honor? It's all concentrated in one area. That would make sense. I'm sorry. Yeah. That would make sense. But I can't speak to that. There's no evidence that it was aesthetically better. It's the only thing that I can't. Not even from Silas. Let me take you back for a second to this idea of parsing out this thing in individual claims. The trial court, in fact, did parcel out two of the parts, right? The improvement and the taxes, right? Yes, Your Honor. How is it okay for the trial court to divvy this thing up and it's not okay to divvy up the payments? There's a difference between divvying up the unjust enrichment claim and the contract claim. The contract claim is $150,000. That deals only with the contract. The other items deal with unjust enrichment. The court found that of those claims, the taxes being paid and the destruction of the house were beneficial to the estate under an unjust enrichment. I guess I misunderstood maybe your opponent's argument because I thought he got up and said we thought we had a contract. There was a contract, but it turns out the contract was declared invalid or whatever by another court because she didn't have title in her name so that the lawsuit was in total for unjust enrichment. Is it a contract claim that he's making here now? That's my understanding that there isn't. The contract claim would fail because there wasn't a contracting party that had title to the property, right? That's correct. The contract did fail. And the administrator, I think the record shows the administrator did have to sue Silas James to get the property deeded back to the estate. Anything else you want to add to that? No. There's just one thing that I mean, I think in its totality that the position of Silas Jane is ridiculous. And I appreciate the court's smile because recently, and I don't know if the court gets to observe movies, but I heard a term in a movie lately called, a character uses the term ridonkulous, and it seems silly, but it keeps popping in my head. These are the most ridonkulous arguments I've ever heard. They're just silly. How do you spell ridonkulous? Oh, Your Honor, I'm lucky I could spell my name most days. Thank you very much for your patience. Just so the record's clear, I was fondly remembering the aesthetic value of a Newark kid. That's what got a smile on my face. I wasn't counting anybody's argument beyond that point. Judge, I think we've fleshed out the issues, but let me just make a few comments here. The notarization issue. My client didn't contest that the notarization was improper. And that was one of the bases, apparently, for the original invalidation of the sale. The attorney told him that because his mother was ill, he didn't have to see it. He would just notarize it. That was wrong. We acknowledge that. I think the remedy for that is return of the real estate. That has nothing to do with the unjust enrichment claim, and I don't see how we can use that as kind of a double whammy against my client. Not only are you going to lose the contract purchase of the property, but also lose the unjust enrichment claim based on that. Is your purchase price a contract claim, then, or an unjust enrichment claim? No, it's an unjust enrichment claim. Well, what's your response to his position of whether it's a contract claim or an unjust enrichment claim? The $150,000 portion of it is not divisible. We can't be picking and choosing between payments. I mean, the claim that your client and his counsel had to get past summary directive verdict was I paid $150,000. And you don't get by that partially by saying, well, I can verify, you know, 15 of those. I disagree with counsel on that because I think that the issue in an unjust enrichment claim is he should be reimbursed for what he improperly paid or unjustly paid. And whether that's a small amount or a large amount, whatever he can prove that he paid, he should be reimbursed for. I think that's the nature of the unjust enrichment claim. Let me make another point unrelated in regard to the competency of Mrs. Jane. It's true that Alex Jane testified that he thought she was confused at that time period. But we went on to page 60 of the record to indicate that he had specifically had conversations about this transaction and that he believed, based on those conversations, that her transfer was voluntary. So I think that's a far more specific thing to say in regard to the transfer of this claim than anything regarding. No one's contesting that she sold the property to him, but she didn't have title to it. That was decided in a different case. The question is whether or not she received those cash payments. Well, I thought counsel was suggesting that because she was perhaps confused, she could have signed the deed without recognizing what she was doing. And I just want to make sure that that's clear in the record. There's a basis for understanding what she was doing at the time. He also argued that it would be illogical for her to sell it to one son. Alex Jane testified that originally he was opposed to a transfer to one son. They had conversations with his mother, and then he relented and said, I understand her reasoning. So I don't think there's anything inherently unreasonable about this transfer. It somehow casts suspicion on whether he made the payments. Counsel also argues that the reimbursement of the money is a credibility issue generally, and frankly, that's, of course, our position. If it's a general credibility determination, it could be only made at the conclusion of the trial. It shouldn't have been made in a truncated hearing like this. He should have allowed them to present their evidence, allowed us to present our rebuttal, and made a ruling based on whatever credibility determinations he had at that time. Based on that, I suggest that the court withdraw, and we should go forward with the reimbursement. All right, thank you both for your arguments. The matter will be taken under advisement. The decision will issue in due course. The court will stay in recess until about 1 o'clock. Thank you.